Gi Nam Lee (SBN: 204561)
Trustable Law PC
8350 Wilshire Blvd., Suite 210
Beverly Hills, CA 90211
Phone: 323-879-9300
Email: GiNam.Lee@TrustableLaw.com

Attorney for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION – LOS ANGELES

| | |
|---|---|
| ROYAL GROUP PLAZA, LLC, a California limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>DISH WIRELESS L.L.C., a Colorado limited liability company;<br><br>and DOES 1-25, inclusive,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>**(JURY DEMAND)** |

**I.   . INTRODUCTION**

1.     This action arises out of Defendant DISH Wireless L.L.C.'s ("DISH" or "Defendant") calculated and baseless attempt to escape its clear and undisputed contractual obligations under a Site Lease Agreement and First Amendment (collectively, the "Agreement") with Plaintiff Royal Group Plaza, LLC ("Plaintiff" or "Landlord"). DISH has unilaterally declared that it is excused from performing its obligations under the Agreement based on the contrived claim that a voluntary and highly profitable business decision by its parent company, EchoStar Corporation ("EchoStar"), to sell certain wireless spectrum licenses somehow

1

constitutes a force majeure event or frustrates the purpose of the Agreement. Neither the facts nor the law support DISH's position.

2. On December 30, 2021, Plaintiff and DISH entered into the Agreement for the lease of premises located at 3407 W. 6th Street, Los Angeles, California 90020 (the "Premises") for the installation and operation of a telecommunications facility. The Agreement provides for an initial five-year term with three automatic five-year renewal terms, monthly rent of $3,700.00 with a 3% annual escalation, and a monthly utility payment of $550.00, also subject to a 3% annual escalation.

3. On October 27, 2025, DISH sent Plaintiff a letter (the "Repudiation Letter") purporting to be excused from all of its contractual obligations under the Agreement. In this letter, DISH claimed that an inquiry by the Federal Communications Commission ("FCC") into EchoStar's spectrum licenses, and EchoStar's subsequent agreements to sell certain of those licenses to AT&T Inc. ("AT&T") and Space Exploration Technologies Corporation ("SpaceX"), have "frustrated the principal purpose and completely destroyed the value of the Agreement and made it impossible for DISH Wireless to perform." DISH further invoked the Agreement's force majeure clause in an attempt to justify its non-performance.

4. DISH's purported justifications for its repudiation are factually false, legally meritless, and transparently designed to shift the costs of its parent company's strategic business pivot onto Plaintiff and other contractual partners. The FCC never ordered EchoStar to sell its spectrum licenses. Rather, EchoStar made a voluntary and extraordinarily profitable business decision to sell those assets for approximately $40 billion. EchoStar's own Chairman, Charlie Ergen, publicly stated that the spectrum was sold at a "market price," not in a "fire sale," and that the transactions would leave EchoStar "cash-rich." Mr. Ergen further

stated that EchoStar would have "won the battle with the FCC" had it chosen to contest the inquiry. A voluntary, profit-driven sale of corporate assets in response to a regulatory inquiry does not constitute a force majeure event, nor does it support a claim of frustration of purpose under California law.

5. Following its repudiation, DISH has failed to pay rent and utility charges that were due on December 1, 2025, and subsequent monthly payments. Despite receiving a formal demand letter from Plaintiff on December 9, 2025, which provided DISH with the required thirty-day notice to cure its monetary default pursuant to Section 8.1(a) of the Agreement, DISH has refused to cure its default or retract its repudiation.

6. Plaintiff now seeks damages for DISH's breach of the Agreement, including all rent and utility payments due for the remainder of the current term totaling $113,130.24, plus any additional amounts that have accrued or will accrue, together with attorneys' fees, costs, and declaratory relief confirming that DISH's obligations under the Agreement have not been excused.

## II. PARTIES

7. Plaintiff Royal Group Plaza, LLC is a California limited liability company with its principal place of business at 3407 W. 6th Street, Suite #510, Los Angeles, California 90020. Plaintiff is the owner of the real property located at 3407 W. 6th Street, Los Angeles, California 90020, upon which the Premises are located.

8. Defendant DISH Wireless L.L.C. is a Colorado limited liability company with its principal place of business at 5701 South Santa Fe Blvd., Littleton, Colorado 80120. Upon information and belief, DISH DBS Corporation is DISH's sole member, and DISH DBS Corporation is a Colorado corporation with its principal place of business in Englewood, Colorado. DISH is the mobile

and 5G network arm of EchoStar Corporation and operates the Boost Mobile wireless communications business. DISH is a party to the Agreement.

9. EchoStar Corporation is a Nevada corporation headquartered in Englewood, Colorado. EchoStar is the ultimate parent company of Defendant DISH. Although EchoStar is not named as a defendant in this action, its conduct and public statements are relevant to establishing that DISH's claimed excuses for non-performance are factually false and legally baseless.

## III.  JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to California Code of Civil Procedure section 410.10, as this action concerns a contract to be performed in this state, and Defendant has engaged in conduct within this state giving rise to the claims asserted herein.

11. Venue is proper in this Court pursuant to California Code of Civil Procedure section 392, subdivision (a)(1), as this action concerns real property located in Los Angeles County, California.

12. Additionally, pursuant to Section 12.8 of the Agreement, the Agreement shall be construed, governed, and enforced in accordance with the laws of the State of California.

13. The amount in controversy exceeds the jurisdictional minimum of this Court.

## IV.  FACTUAL ALLEGATIONS

A. The Site Lease Agreement

14. On December 30, 2021, Plaintiff and DISH entered into a Site Lease Agreement (the "Original Agreement") pursuant to which Plaintiff leased to DISH

4

COMPLAINT
(Royal Plaza Group v. Dish Wireless)

approximately sixty (60) square feet of space at the Premises for the use and operation of a telecommunications facility, including the installation of antennas, radios, supporting appurtenances, cable trays, cabling, and other necessary components.

15. The Original Agreement provides for an initial term of sixty (60) months, commencing on the first day of the month following the commencement of DISH's installation (the "Commencement Date"), unless terminated sooner, renewed, or extended in accordance with the Agreement.

16. Pursuant to Section 2.2 of the Original Agreement, the initial term automatically renews for up to three (3) additional terms of sixty (60) months each, unless DISH elects not to renew by providing Landlord written notice at least ninety (90) days prior to the end of the then-current term.

17. The parties expressly agreed in Section 2.2 of the Original Agreement that "this Agreement constitutes a binding and valid obligation on each Party and that each Party has vested rights in this Agreement as of the Effective Date."

18. Pursuant to Section 2.3 of the Original Agreement, DISH agreed to pay Plaintiff monthly rent for the Premises in the amount of $3,700.00 per month, with subsequent rent payable by the fifth day of each month. On each anniversary of the Commencement Date, the rent automatically increases by three percent (3%) of the then-current rent.

19. On September 27, 2023, the parties executed a First Amendment to Site Lease Agreement (the "First Amendment"), which, among other things, corrected a scrivener's error in the property address and established a monthly utility payment of $550.00, payable six months in advance, with a 3% annual escalation on each anniversary of the Commencement Date.

20. Pursuant to the terms of the Agreement, DISH has been operating telecommunications equipment at the Premises since the Commencement Date and has been obligated to pay rent and utility charges throughout the term.

B. DISH's Anticipatory Repudiation of the Agreement

21. On October 27, 2025, Plaintiff received the Repudiation Letter from DISH, signed by Arnold Agcaoili, VP, Network Development. In this letter, DISH claimed that an FCC inquiry into EchoStar's spectrum licenses and EchoStar's subsequent agreements to sell certain of those licenses to AT&T and SpaceX "have frustrated the principal purpose and completely destroyed the value of the Agreement and made it impossible for DISH Wireless to perform."

22. In the Repudiation Letter, DISH stated: "As a result, DISH Wireless's obligations are excused." DISH further stated that the letter "will serve as notice under the Agreement of the events described herein, to the extent required, including without limitation with respect to any force majeure event."

23. The Repudiation Letter constitutes an unequivocal and definite refusal by DISH to perform its future obligations under the Agreement. By declaring that its "obligations are excused," DISH has communicated its intention not to honor its contractual commitments for the remainder of the term, including its obligations to pay rent and utility charges.

24. DISH's Repudiation Letter constitutes an anticipatory repudiation of the Agreement, which is an immediate, material breach entitling Plaintiff to pursue all available remedies without waiting for future payments to become due.

C. DISH's Failure to Pay Rent and Utility Charges

25. Following its anticipatory repudiation, DISH has failed to pay rent and utility payments that were due on December 1, 2025, and has continued to fail to make payments due thereafter.

26. Pursuant to Section 2.3 of the Original Agreement and Section 4.1 of the First Amendment, DISH is obligated to pay monthly rent and utility payments by the fifth day of each month.

27. DISH's failure to make these required payments constitutes a Default under Section 8.1(a) of the Agreement, which provides that a Default occurs upon "Tenant's failure to make any payment required by this Agreement within thirty (30) days after receipt of written Notice from the Landlord of such failure to pay."

D. Plaintiff's Demand Letter and DISH's Failure to Cure

28. On December 9, 2025, Plaintiff, through undersigned counsel, sent DISH a formal demand letter (the "Demand Letter") via certified mail, return receipt requested, and via email. The Demand Letter served as Plaintiff's formal notice of default pursuant to Section 8.1 of the Agreement.

29. In the Demand Letter, Plaintiff demanded that DISH: (1) immediately remit all past-due rent and utility payments for December 2025; and (2) provide Plaintiff with an unconditional written retraction of the October 27, 2025 Repudiation Letter and provide unequivocal written assurance that DISH would fully and faithfully perform all of its obligations under the Agreement for the remainder of the term, including all renewal terms.

30. The Demand Letter advised DISH that pursuant to Section 8.1(a) of the Agreement, DISH had thirty (30) days from receipt of the notice to cure its monetary default. The Demand Letter further advised that failure to both cure the monetary default and retract the repudiation within this timeframe would be deemed a conclusive election by DISH to breach the Agreement.

31. More than thirty (30) days have elapsed since DISH received the Demand Letter. Upon information and belief, DISH has failed to cure its monetary default by remitting all past-due rent and utility payments, and DISH has failed to retract its repudiation or provide assurance that it will perform its obligations under the Agreement.

32. DISH's failure to cure its default within the thirty-day period provided by Section 8.1(a) of the Agreement constitutes an uncured Default, entitling Plaintiff to terminate the Agreement and pursue all remedies available at law and in equity pursuant to Section 8.2 of the Agreement.

E. The FCC Inquiry and EchoStar's Voluntary Spectrum Sales

33. In May 2025, the FCC initiated an inquiry into EchoStar's utilization of certain spectrum licenses. On May 9, 2025, FCC Chairman Brendan Carr informed EchoStar that he had directed FCC staff to begin a review of EchoStar's compliance with its federal obligations to provide 5G service throughout the United States per the terms of its federal spectrum licenses.

34. The FCC's inquiry was prompted by EchoStar's own failure to meet its buildout commitments. EchoStar had made public commitments to the FCC to deploy a nationwide 5G network, including a guarantee that its network would reach 70% of the U.S. population by 2023. EchoStar failed to meet these commitments, and its network utilization lagged behind its promises.

35. The risk that the FCC would scrutinize a licensee's failure to meet buildout milestones is a fundamental and well-known risk in the telecommunications industry. EchoStar's own SEC filings disclosed the risk that its spectrum licenses could be revoked for failure to comply with FCC requirements. In its Form 10-K for the year ending December 31, 2019, DISH Network Corporation (now EchoStar) disclosed that "[f]ailure to comply with

FCC requirements in a given license area could result in revocation of the license for that license area."

36. In response to the FCC inquiry, EchoStar vigorously contested any suggestion that the FCC had grounds to take adverse action against its spectrum licenses. In a formal, written submission to the FCC on June 6, 2025, EchoStar wrote that any FCC action to revoke or modify its licenses would be "unlawful, unconstitutional, discriminatory, and utterly baseless."

37. The FCC never ordered EchoStar to sell its spectrum licenses. At no point did the FCC or any other regulatory body or court order EchoStar to dispose of its spectrum assets.

38. Rather than contest the FCC inquiry—which EchoStar believed it would win—EchoStar made a strategic and voluntary business decision to sell certain of its spectrum licenses to AT&T and SpaceX for approximately $40 billion.

39. On August 26, 2025, EchoStar announced a definitive agreement to sell its 3.45 GHz and 600 MHz spectrum licenses to AT&T for approximately $23 billion. On September 7-8, 2025, EchoStar announced that it had entered into a definitive agreement to sell its AWS-4 and H-block spectrum licenses to SpaceX for approximately $17 billion.

40. EchoStar's Chairman, Charlie Ergen, publicly characterized these transactions as a profitable business decision, not a forced sale. Mr. Ergen stated that the spectrum was sold at a "market price," not in a "fire sale," and that the transactions would leave EchoStar "cash-rich." AT&T's CEO Dan Meyer publicly acknowledged that AT&T was "well aware that what [AT&T is] paying is more than what [EchoStar] paid for spectrum at auction."

41. Mr. Ergen further stated that EchoStar "would have won the battle" with the FCC if it had chosen to contest the inquiry, but was concerned with the

length of any proceedings. This statement conclusively demonstrates that EchoStar was not forced to sell its spectrum licenses but rather made a voluntary business decision to do so.

42. Following the spectrum sales, EchoStar announced that DISH would transition Boost Mobile to a hybrid Mobile Virtual Network Operator ("MVNO") model, whereby Boost Mobile would offer cell coverage to its customers through network infrastructure leased from other wireless carriers. EchoStar has told investors that operating as a hybrid MVNO will enable Boost Mobile to become "way more competitive" and a "good growth business."

43. EchoStar's CEO and President, Hamid Akhavan, has publicly stated that the spectrum transactions have "kept [EchoStar] in a marketplace in a very aggressive way without any limitations to grow and compete," and that EchoStar continues to hold spectrum licenses and still has a "great subscriber base in the marketplace."

44. DISH's claim that it is "impossible" for it to perform its obligations under the Agreement is belied by these facts. Nothing about EchoStar's voluntary spectrum sales prevents DISH from continuing to pay rent and utility charges as required by the Agreement. DISH's value proposition may have changed as a result of EchoStar's strategic business pivot, but DISH retains the ability to make required payments and remains bound by its contractual obligations.

F. DISH's Purported Force Majeure and Frustration of Purpose Defenses Are Legally Baseless

45. DISH's invocation of the force majeure clause in Section 12.6 of the Agreement is meritless. That clause excuses nonperformance only for specific, enumerated events that are "beyond [a party's] reasonable control," such as "strikes, lockouts, pandemics, labor troubles, acts of God, accidents, technical

failure governmental restrictions, insurrections, riots, enemy act, war, civil commotion, fire, explosion, flood, windstorm, earthquake, natural disaster or other casualty."

46. A voluntary, profit-driven sale of corporate assets by DISH's parent company in response to a regulatory inquiry does not fall within any of these enumerated categories. The term "governmental restrictions" plainly refers to a binding order, law, or regulation that legally or physically prohibits a party from performing its obligations. The FCC's inquiry was not such a restriction; it was an investigation that prompted a strategic business decision by EchoStar.

47. Moreover, force majeure requires that the event be unforeseeable and beyond the affected party's control. The risk of FCC scrutiny of spectrum license utilization was foreseeable and was, in fact, disclosed by EchoStar in its SEC filings. The FCC inquiry itself arose from EchoStar's and DISH's own failure to deploy their network as promised. A party cannot claim force majeure from circumstances it created through its own actions or inactions.

48. DISH's claim of frustration of purpose is equally meritless. Under California law, the frustration of purpose doctrine is applied sparingly and only where a supervening event, not reasonably foreseeable by the parties, has destroyed the fundamental reason for entering into the contract.

49. DISH's frustration of purpose claim fails on every element. First, the events were entirely foreseeable. The risk that the FCC would scrutinize a licensee's failure to meet buildout milestones was a well-known industry risk that EchoStar disclosed in its own SEC filings. Second, the alleged frustrating event was within DISH's control. The FCC inquiry arose directly from DISH's and EchoStar's own failure to deploy their network as promised. Third, the principal purpose of the Agreement has not been destroyed. The purpose of the Agreement is to permit DISH to operate telecommunications equipment at the Premises.

DISH can still do so. EchoStar's strategic decision to pivot to a hybrid MVNO model may make operating this specific site less profitable or desirable for DISH, but a mere decline in profitability or a change in economic circumstances does not constitute frustration of purpose under California law.

50. Other landlords have already challenged DISH's identical claims in federal court. On October 20, 2025, American Tower filed a Complaint for Declaratory Judgment against DISH in the United States District Court for the District of Colorado, Case No. 1:25-cv-03311, alleging that DISH's purported excuse for non-performance is "contrived and without basis in fact or law." On November 20, 2025, Crown Castle filed a similar Complaint for Declaratory Relief against DISH in the same court, Case No. 1:25-cv-03756, alleging that DISH's force majeure claim has "no support in the Agreements and is belied by EchoStar's public statements to its investors, the FCC, and the SEC."

G. Damages

51. As a result of DISH's anticipatory repudiation and breach of the Agreement, Plaintiff has suffered and will continue to suffer damages.

52. Pursuant to the Agreement, DISH owes Plaintiff the following amounts for rent and utility payments due from December 1, 2025 through November 30, 2027 (the end of the current initial term):

| Lease Year / Payment Type | Dates | Payment Amount | Totals |
| --- | --- | --- | --- |
| Year 4 / Rent | 12/01/25 – 11/30/26 | $1.043.09 x 12 | $48,517.08 |
| Year 5 / Rent | 12/01/26 – 11/30/27 | $4,164.38 x 12 | $49,872.56 |
| Year 4 / Electric | 12/01/25 – 11/30/26 | $601.01 x 12 | $7,212.12 |
| Year 5 / Electric | 12/01/26 – 11/30/27 | $619.94 x 12 | $7,428.48 |

|  | Total | $113,130.24 |
|---|---|---|

53. Plaintiff is entitled to recover all rent and utility payments due for the remainder of the current term, totaling $113,130.24, plus any additional amounts that have accrued or will accrue.

54. Pursuant to Section 12.15 of the Agreement, Plaintiff is entitled to recover its costs, expenses, and reasonable attorneys' fees incurred in connection with enforcing its rights under the Agreement.

## FIRST CAUSE OF ACTION
### Breach of Contract – Anticipatory Repudiation
### (Against Defendant DISH Wireless L.L.C.)

55. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 53 above as though fully set forth herein.

56. On December 30, 2021, Plaintiff and DISH entered into a valid and enforceable Site Lease Agreement, which was amended by the First Amendment dated September 27, 2023.

57. Plaintiff has performed all obligations required of it under the Agreement, or has been excused from performing any remaining obligations.

58. On October 27, 2025, DISH sent Plaintiff the Repudiation Letter in which DISH declared that its "obligations are excused" and invoked the Agreement's force majeure clause in an attempt to justify its refusal to perform.

59. The Repudiation Letter constitutes an unequivocal, absolute, and unconditional refusal by DISH to perform its obligations under the Agreement for the remainder of the term.

60. DISH's anticipatory repudiation constitutes a material breach of the Agreement.

61. DISH's claimed excuses for non-performance—force majeure and frustration of purpose—are factually false and legally meritless. The FCC never ordered EchoStar to sell its spectrum licenses. EchoStar voluntarily sold its spectrum assets in a highly profitable business transaction. The events on which DISH relies were foreseeable and within the control of DISH and its affiliates. Neither the force majeure clause of the Agreement nor the frustration of purpose doctrine excuses DISH's performance.

62. As a direct and proximate result of DISH's anticipatory repudiation and material breach of the Agreement, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial, but not less than $113,130.24, representing all rent and utility payments due for the remainder of the current term.

63. Pursuant to Section 12.15 of the Agreement, Plaintiff is entitled to recover its costs, expenses, and reasonable attorneys' fees incurred in connection with enforcing its rights under the Agreement.

## SECOND CAUSE OF ACTION

**Breach of Contract – Failure to Pay Rent and Utilities**

**(Against Defendant DISH Wireless L.L.C.)**

64. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 62 above as though fully set forth herein.

65. On December 30, 2021, Plaintiff and DISH entered into a valid and enforceable Site Lease Agreement, which was amended by the First Amendment dated September 27, 2023.

66. Pursuant to Section 2.3 of the Original Agreement and Section 4.1 of the First Amendment, DISH is obligated to pay monthly rent and utility payments by the fifth day of each month.

67. Plaintiff has performed all obligations required of it under the Agreement, or has been excused from performing any remaining obligations.

68. DISH has failed to pay rent and utility payments due on December 1, 2025, and has continued to fail to make payments due thereafter.

69. On December 9, 2025, Plaintiff sent DISH the Demand Letter, which served as formal notice of default pursuant to Section 8.1 of the Agreement.

70. More than thirty (30) days have elapsed since DISH received the Demand Letter. DISH has failed to cure its monetary default by remitting all past-due rent and utility payments as required by Section 8.1(a) of the Agreement.

71. DISH's failure to make required payments constitutes a material breach of the Agreement.

72. As a direct and proximate result of DISH's breach of the Agreement, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial, including but not limited to all unpaid rent and utility payments.

73. Pursuant to Section 12.15 of the Agreement, Plaintiff is entitled to recover its costs, expenses, and reasonable attorneys' fees incurred in connection with enforcing its rights under the Agreement.

### THIRD CAUSE OF ACTION
### Declaratory Relief
### (Against Defendant DISH Wireless L.L.C.)

74. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 73 above as though fully set forth herein.

75. An actual and substantial controversy exists between Plaintiff and DISH regarding the parties' rights and obligations under the Agreement.

76. DISH contends that its obligations under the Agreement have been excused due to force majeure and/or frustration of purpose arising from the FCC inquiry and EchoStar's spectrum sales to AT&T and SpaceX.

77. Plaintiff contends that DISH's obligations under the Agreement have not been excused, that the Agreement remains in full force and effect, and that DISH remains obligated to perform all of its obligations under the Agreement.

78. This controversy is ripe for judicial resolution. DISH has declared its position in the Repudiation Letter and has acted in accordance with that position by failing to make required payments. Plaintiff has rejected DISH's position in the Demand Letter and has demanded that DISH perform its obligations.

79. Plaintiff desires a judicial declaration of the parties' rights and obligations under the Agreement.

80. Plaintiff is entitled to a declaration that:

    a. DISH's obligations under the Agreement have not been excused by force majeure;

    b. DISH's obligations under the Agreement have not been excused by frustration of purpose;

    c. The Agreement remains in full force and effect;

    d. DISH remains obligated to perform all of its obligations under the Agreement, including but not limited to its obligations to pay rent and utility charges for the remainder of the term; and

    e. DISH's Repudiation Letter dated October 27, 2025 is ineffective to terminate or modify the Agreement or to excuse DISH's performance thereunder.

81. A judicial declaration is necessary and appropriate to resolve the controversy between the parties and to provide Plaintiff with certainty regarding its rights under the Agreement.

## III. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Royal Group Plaza, LLC prays for judgment against Defendant DISH Wireless L.L.C. as follows:

1. On the First Cause of Action (Breach of Contract – Anticipatory Repudiation):
    i. For compensatory damages in an amount to be proven at trial, but not less than $113,130.24, representing all rent and utility payments due for the remainder of the current term;
    ii. For prejudgment interest at the legal rate;
    iii. For costs, expenses, and reasonable attorneys' fees pursuant to Section 12.15 of the Agreement;
2. On the Second Cause of Action (Breach of Contract – Failure to Pay Rent and Utilities):
    i. For compensatory damages in an amount to be proven at trial, including but not limited to all unpaid rent and utility payments;
    ii. For prejudgment interest at the legal rate;
    iii. For costs, expenses, and reasonable attorneys' fees pursuant to Section 12.15 of the Agreement;
3. On the Third Cause of Action (Declaratory Relief):

For a judicial declaration that:

   i. DISH's obligations under the Agreement have not been excused by force majeure;
   ii. DISH's obligations under the Agreement have not been excused by frustration of purpose;

iii. The Agreement remains in full force and effect;

iv. DISH remains obligated to perform all of its obligations under the Agreement, including but not limited to its obligations to pay rent and utility charges for the remainder of the term; and

v. DISH's Repudiation Letter dated October 27, 2025 is ineffective to terminate or modify the Agreement or to excuse DISH's performance thereunder;

4. On All Causes of Action:

   a. For costs of suit incurred herein;

   b. For such other and further relief as the Court deems just and proper.

Dated:    February 2, 2026       TRUSTABLE LAW PC

                                             By:   /s/ Gi Nam Lee

                                             Attorneys for Plaintiff

**JURY DEMAND** Pursuant to Federal Rule of Civil Procedure 38, Plaintiff Hereby demands a trial by jury on all issues so triable.